**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
XIAMEN ITG GROUP CORP., LTD.,

                             Plaintiff,          <u>**REPORT AND RECOMMENDATION**</u>

        -against-                                **19-CV-6524 (DLI) (ST)**

PEACE BIRD TRADING CORP.,

                             Defendant, and

XING LIN (USA) INTERNATIONAL
CORP., and CRYSTAL VOGUE INC.,

                             Counterclaim Plaintiffs.
--------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

Xiamen ITG Group Corporation, Limited ("Plaintiff" or "ITG") brought this action on November 19, 2019, alleging twenty counts of breach of contract against Peace Bird Trading Corporation ("Defendant Peace Bird") for failure to pay sums owed for purchases of textiles, pursuant to the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). On December 31, 2019, Defendant Peace Bird filed an Answer to the Complaint, joining Xing Lin (USA) International Corporation ("Defendant Xing Lin") and Crystal Vogue Incorporated ("Defendant Crystal Vogue") (together, "Defendants")[1], and asserting five counterclaims against Plaintiff for breach of implied covenant of good faith and fair dealing, promissory estoppel, and fraud in the inducement. On February 11, 2020, Plaintiff filed a Reply, asserting seven additional breach of contract claims against Defendants Xing Lin and Crystal

---

[1] Xing Lin and Crystal Vogue are identified in the case caption as counterclaim plaintiffs. However, all three entities are owned by the same principal and, for purposes of this action, Xing Lin's and Crystal Vogue's interests are aligned with Defendant Peace Bird, and they were all buyers of products sold by ITG for which ITG alleges breach of contract. Given that ITG subsequently joined claims against both Xing Lin and Crystal Vogue, the Court will collectively refer to Peace Bird, Xing Lin, and Crystal Vogue as "Defendants" for purposes of this motion.

Vogue. After the parties completed discovery and dispositive motion practice began, counsel for Defendants sought leave to withdraw. On November 8, 2023, defense counsel's motion to withdraw was granted, and Defendants were given forty-five days to retain alternate counsel to avoid default. Defendants have since failed to file an appearance.

Before this Court is Plaintiff's motion for default judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 55(b)(2) and to dismiss Defendants' counterclaims for failure to prosecute pursuant to FRCP 41(b). The motion was referred to this Court for a Report and Recommendation by the Honorable Dora Lizette Irizarry. For the reasons set forth below, the Court respectfully recommends that Plaintiff's motion for default judgment be DENIED WITHOUT PREJUDICE, that Plaintiff's motion to dismiss Defendants' counterclaims be GRANTED, and that Defendants' counterclaims be DISMISSED WITH PREJUDICE.

## BACKGROUND

For purposes of a motion for default judgment, the Court is required to accept Plaintiff's alleged facts as true. *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 188 (2d Cir. 2015) (per curiam); *Henry v. Oluwole*, 108 F.4th 45, 55 (2d Cir. 2024). As such, the following facts are drawn from Plaintiff's Complaint and Reply,[2] as well as the materials submitted in support of this motion on which the pleadings integrally rely, namely, the relevant sales contracts that form the basis of Plaintiff's twenty-seven breach of contract actions.[3] Courts do not, however, credit conclusory allegations on

---

[2] After Defendants filed their Answer to Plaintiff's Complaint, joining Defendants Xing Lin and Crystal Vogue and asserting various counterclaims, Plaintiff filed a responsive pleading entitled "Answer to Counterclaims and to Claims of Counterclaim Plaintiffs; and Counterclaims Against Counterclaim Plaintiffs," which, in addition to answering Defendants' counterclaim allegations, asserted additional claims against the newly joined parties. *See* ECF No. 15 (hereinafter "Reply"). For clarity, so as not to be confused with Defendants' Answer, the Court will refer to this responsive pleading as Plaintiff's "Reply."

[3] Typically, courts articulating the standard for which documents are deemed included in a complaint are doing so in the context of Rule 12(b)(6) motions to dismiss. *See, e.g., United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (ruling that complaints are deemed to include documents attached to the complaint, documents

- 2 -

motions for default judgment. *Henry*, 108 F.4th at 55, 57–60, 62. As Plaintiff's submissions total over 1,000 pages, the Court assumes familiarity with the documents in question. In many instances, the Court will cite to examples rather than providing exhaustive citations to every transaction relevant to a fact contained herein.

## I.    Facts Alleged in the Complaint.

Plaintiff ITG is a Chinese corporation which is engaged in the sale of fabrics and textiles. Compl. ¶¶ 1-2, 6, ECF No. 1. In 2016 and 2017, Plaintiff engaged in a series of transactions in which it agreed to sell and ship various fabrics and textiles to Defendants.[4] *See, e.g.*, Compl. ¶¶ 1, 6, 21; Reply ¶¶ 40, 45. The initial writings, identified as "Sales Contracts," listed the purchaser of the product, an item number identifying the type of fabric, the quantity, the unit price, the payment

---

incorporated by reference, and documents integral to the complaint). However, as the Second Circuit has noted, courts apply an "identical standard" to test the sufficiency of complaints for both Rule 12(b)(6) motions to dismiss and motions for default judgment. *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014); *see also Grp. One Ltd. v. GTE GmbH*, 625 F. Supp. 3d 28, 65 (E.D.N.Y. 2022) (same) (collecting cases); *Henry*, 108 F.4th at 55 (noting that the standard for default judgments, in which courts take all well-pleaded factual allegations as true and disregard conclusory allegations of law, "resembles [the standard] applicable to a motion to dismiss"). As such, courts considering motions for default judgment consider documents attached to, incorporated in, or integral to the complaint according to the same standards applicable for Rule 12(b)(6) motions. *See, e.g.*, *Flanagan v. Marco Martelli Assocs., Inc.*, No. 13-CV-6023 ADS AKT, 2015 WL 1042279, at *3 n.1 (E.D.N.Y. Mar. 9, 2015) (collecting cases); *Gesualdi v. Interstate Masonry Corp.*, No. 12-CV-0383 NGG VMS, 2014 WL 1311709, at *3 n.1, *3 n.2 (E.D.N.Y. Mar. 28, 2014) (collecting cases). To that end, contracts are routinely held integral to complaints alleging breach of contract. *Palin v. New York Times Co.*, 940 F.3d 804, 811, 811 n.18 (2d Cir. 2019) (noting that contracts and agreements that are essential to the litigation are typically integral); *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017) ("On a motion to dismiss for breach of contract, courts look not only at the sufficiency of the complaint but also at the contract itself, which by definition is integral to the complaint." (citing *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011))); *Miller v. Metro. Life Ins. Co.*, No. 17-CV-07284 (AT)(SN), 2018 WL 6625096, at *2 (S.D.N.Y. Sept. 25, 2018), *report and recommendation adopted*, No. 17CIV7284ATSN, 2018 WL 5993477 (S.D.N.Y. Nov. 15, 2018) ("A contract is typically deemed integral to a complaint alleging a claim for breach of said contract." (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002))); *Florimon v. Allstate Ins. Co.*, 616 F. Supp. 3d 180, 186 n.2 (D. Conn. 2022) ("A written contract is, of course, integral to a claim that a written contract was breached."); *Am. Builders & Contractors Supply Co. v. CR1 Contracting, LLC*, 565 F. Supp. 3d 330, 341 (W.D.N.Y. 2021) (holding that contract submitted with motion for default judgment could be properly considered because contract was integral to complaint alleging breach of contract).

[4] For each count, Plaintiff repeatedly alleges that the parties "entered into a written Sales Contract," referring to the initial writing between the parties. *See, e.g.*, Compl. ¶ 21. However, as will be discussed, the CISG does not require that contracts be in writing, and there were multiple writings exchanged between the parties for each sales transaction. In some circumstances, it is questionable whether the Sales Contract identified by Plaintiff as the controlling agreement is, in fact, the controlling agreement. To the extent that Plaintiff alleges that the Sales Contracts constitute the bargain between the parties, these allegations are conclusory. Nevertheless, the Court will refer to this writing as a "Sales Contract" or "the contract" to identify this writing.

terms, a date by which the product was to be shipped, and the shipping terms. *See, e.g.*, Compl. ¶¶ 8, 10-11, 14, 21-25; Ex. 1-1A. The parties agreed that the fabrics and textiles would be shipped by Plaintiff from China to Defendants in Mexico. Compl. ¶¶ 7-8.

For the "initial series" of transactions, the parties agreed that the items would be shipped according to a "Cost, Insurance and Freight," or "CIF," delivery term. Compl. ¶¶ 11-13. Under a CIF delivery term, Defendants, as the buyers, were responsible for paying the customs fees, duties, and taxes imposed by Mexico to import the goods. Compl. ¶ 13. However, during the course of their business relationship, the parties agreed to change to a "Landed Duty Paid," or "LDP," delivery term. Compl. ¶¶ 14-15. Under an LDP delivery term, the seller, rather than the buyer, is responsible for paying the government-imposed customs fees, duties, and taxes at the destination port. Compl. ¶ 15. In switching to an LDP delivery term, the parties agreed that Plaintiff would pay the customs fees, duties, and taxes imposed to import the fabrics, and would include this cost in the purchase price of the fabrics sold to Defendants. Compl. ¶ 16. In exchange, Plaintiff alleges that Defendants agreed to reimburse Plaintiff for the customs fees, duties, and taxes paid by Plaintiff, "together with interest at the rate of 4% from the date each such payment was advanced by [Plaintiff] on behalf of [Defendants]." Compl. ¶ 17.

For each of the transactions, Plaintiff arranged for the goods to be transported to the port of departure, and shipped the goods on board a vessel. *See, e.g.*, Compl. ¶¶ 12, 23, 26. Plaintiff then provided relevant documentation to the purchasing Defendant, including a bill of lading, a "Commercial Invoice," and a packing list. *See, e.g.*, Compl. ¶¶ 27, 30, 43, 46. The agreed-upon items were shipped and, for transactions for which the parties had agreed upon an LDP delivery

term, Plaintiff paid the applicable customs fees, duties, and taxes.[5] Compl. ¶ 18. Thus, Plaintiff alleges for each Count that it "has, at all times, performed its obligations under the Sales Contract."[6] *See, e.g.*, Compl. ¶¶ 32, 48, 61, 74, 128. Defendants received the items, but failed to remit payment for the fabrics and textiles when such payments became due.[7] *See, e.g.*, Compl. ¶¶ 18-19, 25, 28, 33-34.

## II.    Documents Integral to the Complaint, and Other Transactional Documents.[8]

A review of the relevant paperwork exchanged between the parties in engaging in these transactions reveals additional information that is not alleged in the Complaint, or that, in some instances, contradicts the allegations in the Complaint. For example, the Sales Contracts contained a field entitled "Contract N[umber]." However, only some of the contracts contained such a number. *See, e.g.*, Ex. 1-5 (containing contract number); Ex. 1-16 (field for contract number not completed). In some circumstances, when the Sales Contracts did include such a number, there were multiple, differing contracts labeled with the same contract number but which detailed

---

[5] The Complaint does not contain any allegations regarding when these payments were remitted, how much was paid, how these payments were remitted, how Plaintiff determined the amount to be paid, or other relevant details. *See generally* Complaint.

[6] This allegation is, for some Counts, internally contradicted by Plaintiff's other allegations. For example, for Count 8, Plaintiff alleges that "[t]he Sales Contract . . . provided that customer item number SPT010 was to be shipped out of any port in China before July 10, 2017." Compl. ¶ 122. Thereafter, Plaintiff alleges that "[o]n July 24, 2017" the purchased items were shipped, before alleging that "Plaintiff ITG, has, at all times, performed its obligations under the Sales Contract." Compl. ¶¶ 125, 128.

[7] Plaintiff's Complaint and Reply allege that Defendants received the shipments. However, the interrogatories that Plaintiff submitted in support of this motion deny receipt of item numbers OCC-0079 and OCC-0076 for Count 4, do not ask about item number OCC-0080 for Count 4, deny receipt of OCC-0078 for Count 5, do not ask about OCC-0077 for Count 5, contain no response for RY1101 for Count 15, do not ask about SO8-9, MF1001-1, or MF1001-2 for Counterclaim Count 5, and do not ask about SPT008 for Counterclaim Count 6. Ex. 8, at 53-56. The Sales Contracts also appear to indicate that Plaintiff prepaid for ground freight from the port of destination to Mexico City inland, where Defendants' warehouse was located. *See, e.g.*, Ex. 1-9 ("Freight Charge Terms: Prepaid to Mexico City, Mexico."). *But see* Ex. 3 (describing that Defendants will purchase insurance for ground transportation and will "have full control of all customs clearance steps of the container from the destination port to our warehouse," which would include ground transportation, but not clarifying whether such "control" involved arranging for ground transport to occur). However, Plaintiff did not submit any documentation indicating whether such transport occurred.

[8] Plaintiff submitted a variety of forms which were exchanged between the parties in effectuating the underlying transactions. While the Sales Contracts that Plaintiff alleges were breached are undoubtedly integral to the pleadings, the remaining forms are not all necessarily "integral" to the pleadings, and Plaintiff has not submitted any argument regarding which forms are and are not properly considerable.

different items, unit prices, or sums. For example, the contracts submitted for item numbers LYM031 and LYM032, both of which are included in Count 1, are labeled with the same contract number but have different unit prices and sums. *Compare* Ex. 1-1A, *with* Ex. 1-1B. For Counts 4 and 5, the contracts contain the same contract number but are for the purchase of different items. *Compare* Ex. 1-4A, *with* Ex. 1-4B, *and* Ex. 1-5. Moreover, a review of the documents yields the conclusion that the customer item numbers were intended to be a single-use, unique number, which would increase in sequence each time a given customer reordered the same product. *See, e.g.*, Ex. 1-1A; Ex. 1-1B (customer item number increasing from LYM031 to LYM032 when Defendant Peace Bird ordered two shipments of the same product). However, in one instance there are two contracts with the same item number, OCC-0078-Z, but for different quantities and a different price per quantifying unit. *See* Ex. 1-4B; Ex. 1-5. In several instances, the sales contracts provided for the purchase of multiple shipments of items, some of which are never mentioned or alleged in Plaintiff's Complaint and for which no documentation was submitted indicating that they ever shipped. *See, e.g.*, Ex. 1-1A (detailing purchase of LYM031-033 but containing no documentation indicating LYM033 shipped); Ex. 1-4B (containing no documentation regarding whether OCC-0076-DP, OCC-0080-DP, or OCC-0078-Z, for the latter at the quantities indicated in this contract rather than the duplicate use of the item number in Count 5, ever shipped); Ex. 1-6 (containing no information regarding whether PFPFD003 through PFPFD006 ever shipped); Ex. 1-7 (containing no documentation indicating that PFPDB003 through PFPDB006 ever shipped).

Often, but not always, the Sales Contract included a provision allowing for an upward or downward deviation from the ordered quantities by a certain percentage. *See, e.g.*, Ex. 1-1A ("Allowance +/-5% more or less of quantities."); Ex. 1-18 (no term regarding deviation). When present, this term provided for a 3 percent, 5 percent, or 10 percent deviation from the quantity

ordered. *See, e.g.*, Ex. 1-1A ("Allowance +/-5% more or less of quantities."); Ex. 1-2A ("Allowance +/-10% more or less of quantities."); Ex. 1-9 ("Allowance +/-3% more or less of quantities."). For many orders, including, but not limited to, Counts 3, 4, 5, 7, 8, and 9, the quantities shipped were either above or below the allowed percentage of deviation. *See, e.g.*, Ex. 1-8. For example, for Count 8, Defendant Peace Bird ordered 22,000 kilograms of a fabric, with the sales contract containing a term allowing for an upward or downward deviation of 5%. *See id.* Under such a term, the minimum that could be shipped in conformance with the agreement was 20,900 kilograms. *See id.* However, only 20,788 kilograms shipped. *See id.* This contrasts with the allegations in the Complaint for Count 8, in which Plaintiff alleges that "Plaintiff ITG, has, at all times, performed its obligations under the Sales Contract." Compl. ¶ 128. For several purchases for which a deviation percentage failed to be included, the shipped quantities nevertheless deviated by more than 3%, 5%, or 10%. *See, e.g.*, Ex. 1-12B (17,500 kilograms ordered and 16,574.9 kilograms shipped, thus falling more than 5% below the ordered quantity); *see also* Ex. 1-20 (14,870 kilograms ordered and 12,970.6 kilograms shipped, more than 10% below the ordered quantity).

Often, but not always, the Sales Contract was "signed" by both parties by affixing the company's corporate seal to the document. *See, e.g.*, Ex. 1-18 (signed by Defendant Peace Bird); Ex. 1-5 (not signed by Defendant Peace Bird). Moreover, while not alleged in the Complaint, there were additional forms that were exchanged between the parties for each transaction. For example, the paperwork exchanged between the parties included a Chinese customs declaration form. *See, e.g.*, Ex. 1-1A, at 5-7; Ex. 1-3, at 5. Also, while not alleged in the Complaint, the papers exchanged between the parties often, but not always, included a "Letter of Payment Guarantee." *See, e.g.*, Ex. 1-3, at 6 (containing Letter of Payment Guarantee); Ex. 1-7 (containing no Letter of Payment

Guarantee). When exchanged, the Letter of Payment Guarantee included information relevant to the shipment of the goods, including the bill of lading number and the date of shipment, and stated "We are one hundred percent promise to pay Xiamen ITG Group Corp.,Ltd. After shipment 180 days ,we assume all the responsibility if caused." *See, e.g.*, Ex. 1-3, at 6. The Letter of Payment Guarantee, when exchanged, was typically executed by the purchasing company by affixing the corporate seal to the letter, although in two circumstances, Defendant Crystal Vogue executed Letters of Payment Guarantee for shipments purchased by Defendant Xing Lin. *See, e.g.*, Ex. 1-3 (payment guarantee executed by Defendant Peace Bird for shipment of goods purchased by Defendant Peace Bird); Ex. 1-X2 (payment guarantee executed by Defendant Crystal Vogue for goods purchased by Defendant Xing Lin); Ex. 1-X3 (payment guarantee executed by Defendant Crystal Vogue for goods purchased by Defendant Xing Lin). In some circumstances, the "Total Amount" of the purchase indicated on the Letter of Payment Guarantee does not match the total on the Commercial Invoice, the latter of which contained substantially more detail about what was shipped, the weight, and the cost per unit. *See, e.g.*, Ex. 1-12A, at 3, 6 (Commercial Invoice total of $66,702.16 and Letter of Payment Guarantee total of $66,738.15); Ex. 1-12B, at 3, 6 (Commercial Invoice total of $65,400.68 and Letter of Payment Guarantee total of $65,321.34). These discrepancies are not explained. In a variety of circumstances, such as for Counts 1, 8, 9, 11, 12, 13, 14, and 15, the dates of shipment on the Letters of Payment Guarantee do not match the dates of shipment on the bills of lading. *See, e.g.*, Ex. 1-1A; Ex. 1-1B.

For Count 9, the Complaint alleges that customer item number WD001-1, consisting of 851 rolls of fabric weighing 17,569.7 kilograms and totaling USD $152,258.82 was shipped in two shipping containers. Compl. ¶¶ 138-140. However, the Commercial Invoice, Packing List, Bill of Lading, and Letter of Payment Guarantee submitted indicate that 587 rolls weighing 12,269.7

kilograms and totaling USD $106,326.22 were shipped in one shipping container, and no additional documentation for WD001-1 was submitted.[9] *See* Ex. 1-9. Moreover, the contract number on the Sales Contract, NLF20170706, matches the contract number for a purchase already awarded in an arbitration before CIETAC. *See* Ex. 5-B.

Additionally, for Count 4, item number OCC-0079, the total of $60,080.21 alleged in the Complaint matches the Commercial Invoice, but the unit prices charged for the items ordered do not match the agreed-upon unit prices in the Sales Contract. Compl. ¶ 72; Ex. 1-4A. For example, the agreed-upon unit price for the "Gadol" pattern was $2.90 per kilogram, which was charged for 989.1 of the kilograms that shipped, but the remaining 2,438.1 kilograms shipped were charged at $3.13 per kilogram, an amount above the contracted-for sum. Ex. 1-4A. Notably, only 917 kilograms of the Gadol pattern were ordered, which appears to match the 989.1 kilograms that were charged at $2.90 per kilogram. Ex. 1-4A. The additional line item for 2,438.1 kilograms charged at a rate of $3.13 per kilogram appears not to have been ordered. *See* Ex. 1-4A. Similarly, for the "Double Pique" pattern, only 1,799 kilograms at $2.80 per kilogram were ordered (for which 1,769.9 kilograms shipped), but there are additional line items totaling 5,924.1 kilograms which were charged at rates of $3.02, $3.05, $2.90, and $2.88 per kilogram, which also appear to not be supported by any Sales Contract between the parties. *See id.* Moreover, the Sales Contract

---

[9] These documents indicate that WD001-1 shipped and was invoiced with MESH001-1, the product detailed in Count 10. While not integral to the Complaint, Plaintiff's affidavits submitted in support of damages repeatedly attempt to list an additional shipment for WD001-1 that is otherwise unsupported by any documentation indicating that it did, in fact, ship, nor that it was appropriately invoiced. *See, e.g.*, Janiec Decl. ¶ 18, ECF No. 67-1 (listing second WD001-1 purchase totaling $45,932.60); Wang Decl. ¶ 40, ECF No. 67-6 (listing second WD001-1 invoice for $45,932.60); Jiang Decl. ¶ 33, ECF No. 67-8 (listing an LDP payment for WD001-1 for $40,000 and an LDP payment for "WD001&MESH001" for $47,000); Jiang Decl. App. A, ECF No. 67-8 (listing an LDP payment for WD001-1 and AYR069-P, an item which is otherwise unmentioned in any of the actions in the Complaint or Reply, as $47,000, and listing an LDP payment for WD001-1 and MESH001-1 as $64,000). The bill of lading number listed in Appendix A of the Jiang Declaration for WD001-1 and AYR069-P matches the bill of lading number for one of the transactions at issue in an arbitration held before the China International Economic and Trade Arbitration Commission (CIETAC), specifically for contract number NLF20170620, for which damages were already awarded. *Compare* Jiang Decl. App. A, *with* Ex. 5-B. The CIETAC arbitration decision does not contain enough information to determine whether any amounts awarded for this shipment may have included charges for item number WD001-1. *See* Ex. 5-B.

itself was not executed by Defendant Peace Bird and there appears to have been no Letter of Payment Guarantee indicating that Defendant Peace Bird ultimately ratified any shipment of the extra goods, nor the elevated unit prices. *See id.*

Finally, while not clearly alleged in the Complaint, when the parties agreed to switch to an LDP delivery term for the transactions between them, they did so by executing a separate LDP agreement, the terms of which were, apparently, to be applicable for all subsequent goods transactions entered into by the parties. Ex. 3. In other words, the terms of the separate LDP written agreement were intended by the parties to apply to the written sales agreements that the parties would enter into with one another going forward. Plaintiff obtained a separate LDP agreement from each of the Defendants. Ex. 3. Although Defendants each executed the agreement by affixing their corporate seals, Plaintiff did not execute the agreement. *See* Ex. 3. The original, executed agreements were drafted in both Chinese and English, but, in support of this motion, Plaintiff also provided an official translation of the Chinese contained in the agreement.[10] *See* Ex. 3. The English contained in the original LDP agreement and the official English translation of the Chinese portions of the agreement are not an exact match, but are similar in several material respects. Specifically, the English portion of the original bilingual agreement stated as follows:

> We guarantee to XIAMEN ITG GROUP CO.,LTD that we will take all responsibility for All orders which we ordered under LDP payment item for below 4 point,
>
> First: we will buy insurance from destination port to our warehouse by ourself under our cost.

---

[10] As explained in Lifang Wang's Declaration, the Chinese portion of the original, executed agreement contained an introductory clause with explanatory background about what an LDP delivery term is, but the agreement did not contain an English translation of these sentences. Wang Decl. ¶ 31. Thus, the certified English translation of the Chinese portion of the agreement contains translations for these sentences. While this is not explained in the Complaint or in the materials considered to be included in the Complaint, a review of the LDP agreements reveals that there is, in fact, an introductory portion which is untranslated. *See* Ex. 3, at 1-3.

> Second: we agree ITG use his relative forwarder ship goods and to be agency with us operative all LDP process.
>
> Third: we will control all the step of customs clearance from destination port to our warehouse, all the risk from these steps undergo our responsibility.
>
> Forth we agree pay 4% more for the cost which XIAMEN ITG GROUP CO.,LTD prepared us for the LDP cost.
>
> All and all, we guarantee all the risk from destination to warehouse even all these under China export & Credit Insurance Corporation, sincerely guarantee for good business and cooperation relationship.

Ex. 3, at 1-3. The official English translation of the Chinese portion of the bilingual agreement

states as follows:

> The U.S. LDP: L.D.P. (landed duty paid) is one of the trade terms in which the seller shall bear import duties, including customs inspection fees and any other taxes and fees payable as a result of goods importation and delivery to the buyer. LDP usually means that the seller conducts customs clearance through a third party forwarder (the third party is often controlled and designated by the seller themselves as the agent for procedures of overall customs clearance). The general probability of LDP trade term in the U.S. has reached 55%, and many American purchasers have gradually shifted CIF to LDP. We guarantee to Xiamen ITG Group Co., Ltd. that we will take full responsibility for the following 4 points for all our orders under the LDP payment terms:
>
> First, we will purchase insurance from the port of destination to our warehouse by ourselves in accordance with the goods cost.
>
> Secondly, we agree ITG to use their designated freight forwarder to operate the entire LDP customs clearance process together with our local customs clearance company.[11]

---

[11] The English version of this clause in the original agreement contained three key points. Namely, Defendants agreed that: (1) "ITG use his relative forwarder ship goods"; (2) ITG would "operat[e] all LDP process"; and (3) ITG would "be agency with us." In the certified translation, the clause appears to contain additional words that have no parallel with the English in the original agreement. Namely, the certified translation states that: (1) "ITG [was] to use their designated freight forwarder"; (2) "to operate the entire LDP customs clearance process"; and (3) "together with our." To this end, "ship goods" appears to parallel "freight," "together with" could reasonably be a linguistic synonym for "agency with," and "our" could be a close derivative of "us." Thus, the certified translation appears to effectively match the English clause in the original agreement word for word up to the word "our." The English clause in the original agreement does not contain any wording that might parallel "local customs clearance company," or that might indicate that ITG was obligated to ensure that the company ITG selected to remit LDP payments would work in conjunction with a company selected by Defendants (*i.e.*, "together with *our* local customs clearance company"). This difference is not explained. For example, the English portion of the agreement may mistakenly omit a clause of a sentence that is present in the Chinese portion. These differences may arguably modify the parties' respective obligations in facilitating the customs clearance process, as the phrase "together with our local customs clearance

Thirdly, we will have full control of all customs clearance steps of the contain from the destination port to our warehouse, and will bear the responsibility for all the risks arising from all these steps.

Fourthly, we agree to pay ITG 4% more of the customs clearance fee as a reward for ITG to advance the LDP cost for us.

All in all: We sincerely guarantee the settlement of all risks in all links from the port of destination to our warehouse under LDP. Even if all of these are covered by China Export Credit Insurance Corporation, we sincerely guarantee for the better business relationship in the future.

Ex. 3, at 4-11.

As discussed, the Complaint alleges that, for purchases made with an LDP delivery term according to the above agreement,[12] Defendants agreed to reimburse Plaintiff for the customs fees, duties, and taxes paid by Plaintiff, "together with interest at the rate of 4% from the date each such payment was advanced by [Plaintiff] on behalf of [Defendants]." Compl. ¶ 17. Notably, however, neither of the above translations mentions the word "interest" or discusses any deadlines or dates regarding when such payment would be due, or when this alleged interest would begin accruing. Rather, the translations state that Defendants agreed to pay "4% more for the . . . LDP cost" and "4% more of the customs clearance fee as a reward," provisions which both appear to stipulate to a 4% flat rate. Ex. 3. The sales contracts exchanged between the parties also do not utilize the term "interest" or provide timeframes for payment. Rather, they simply state the delivery term as follows: "LDP The guest warehouse, customs clearance fee and customs duties are paid by XIAMEN ITG GROUP CORP., LTD." *See, e.g.*, Ex. 1-6. While the Complaint alleges that the

---

company" presumably contemplates a higher degree of involvement by Defendants than what is apparently described in the English portion of the agreement.

[12] As discussed, the Complaint does not explain that the LDP arrangement was effectuated by entering into a separate writing which was intended to complement or supplement the subsequent sales agreements between the parties. However, it impliedly references the separate writing by referring to the parties' "LDP Agreement" as a capitalized term, although it omits a definition thereof. Compl. ¶ 16.

parties "agreed that under their LDP Agreement . . . the amount of the fees, duties, and taxes, that were paid by ITG would be included in the purchase price of the items sold to [Defendants]," neither of the translations mention that the customs fees, duties, and taxes would be included in the item cost. Ex. 3. It is unclear whether this allegation refers to an oral discussion between the parties. Moreover, it is unclear how the parties were supposed to identify the sums upon which any purported 4% accruing interest would be imposed, tracked, or invoiced, if the LDP customs and duty fees were hidden within the itemized prices charged for the products.[13]

## III.    Extrinsic Documents Submitted in Support of Motion for Default Judgment.

The Complaint generally alleges that "[a]s required by the terms of the Sales Contracts, ITG shipped the items purchased by Peace Bird, and paid the customs' fees, duties and taxes on each shipment made by it to Peace Bird," Compl. ¶ 18, but does not specifically allege the amounts paid, or when they were paid, despite alleging that these sums were subject to 4% interest that would begin accruing upon the date of payment. Compl. ¶¶ 17, 20-35. While the question of potential accrual of 4% interest under the LDP agreement speaks to damages, whether Plaintiff paid, and indeed timely paid, LDP customs fees, duties, and taxes in accordance with the terms of

---

[13] In addition to making it more difficult, from an accounting perspective, to track the amounts accrued and owed, this method also does not appear to be otherwise beneficial. It would presumably be more time consuming to increase the unit prices for various items on a list of ordered products in order to "bury" a flat sum among the totals charged than it would be to simply add an extra line item entitled "customs fees" reflecting the amount in question. If this was not done because the total of the customs fees could not be predicted in advance, then one wonders how Plaintiff knew how much to increase the cost of the items by in order to "bury" this sum within the cost of the items charged. Moreover, all of these questions are raised within the context of a series of writings in which Defendants appear never to have agreed to the "burying" of the respective customs or duties fees among the cost of the products. Even assuming that Defendants' signature on the relevant Sales Contracts with these inflated totals reflected agreement to this practice, not all of the Sales Contracts were, indeed, signed by Defendants. Moreover, the "burying" of these sums within the cost of the items charged causes conflicting payment terms for the amounts that are "counted toward" the customs and duties fees. For example, the invoices (which contain the LDP fees within them) contain OA 180 due dates, stipulating that the sum is due within 180 days from the date of shipment. *See, e.g.*, Ex. 1-9. However, according to the materials submitted by the parties, Plaintiff is apparently alleging that Defendants agreed "to pay interest at the rate of 4% on the amount being advanced, from the date of the advance to the date that payment on the shipment became due." Janiec Decl. ¶ 19. Thus, by the time the invoice became due, the total that it stated would be due within 180 days would no longer be the amount actually due and owing. It is thus unclear how Defendants were supposed to determine how much they owed.

the Sales Contracts and the LDP agreement speaks to liability for breach of contract, and Plaintiff's allegation that "Plaintiff ITG, has, at all times, performed its obligations under the Sales Contract." *See, e.g.*, Compl. ¶ 89.

To this end, Plaintiff submitted various forms of documentation to demonstrate that the required LDP payments were, in fact, made in accordance with the parties' agreements. For example, Plaintiff submitted two declarations from two employees, Lifang Wang and Shufang Jiang, alleging a series of efforts in June and July of 2017 to locate a freight forwarder who could manage the LDP payment process in compliance with certain currency restrictions imposed by Chinese law. *See* Wang Decl. ¶¶ 24-37; Jiang Decl. ¶¶ 16-28. These declarations allege that Defendants' principal had identified a freight forwarder who was potentially authorized by the Chinese government to make the necessary LDP payments, Grand Power Express International (China) Limited. Wang Decl. ¶¶ 34-35; Jiang Decl. ¶ 28. Wang's declaration alleges that Plaintiff began shipping out the orders that were made on an LDP basis on June 30, 2017, because Defendants' principal "expressed confidence" that Grand Power would be able to process the payments. Wang Decl. ¶ 35. Wang alleges that, since "[i]t usually takes approximately 3 to 4 weeks for a shipment made by ocean vessel from China to arrive at the destination port in Mexico," Plaintiff began shipping the LDP orders because "[a]t the time, it was felt that by the time that the shipments arrived at the destination port, Grand Power would be in place as Peace Bird's agent and would be in a position to accept the LDP payments made by ITG."[14] *Id.* Wang further alleges that Grand Power "confirmed to ITG that it would be able to process the proposed LDP transactions" "[i]n the latter part of July 2017." *Id.*

---

[14] While the declaration alleges "it was felt," it does not specify by whom it was felt.

Both declarations allege that, while the LDP orders had been shipped between June 30, 2017, and July 31, 2017, Plaintiff "still had not received the authorization from [Defendants] to advance the LDP payments to Grand Power." *Id.* ¶ 36; *see also* Jiang Decl. ¶ 29. Wang's declaration states that "[i]t was not until on or about August 10, 2017, that ITG received the authorization from Peace Bird for Grand Power to receive the LDP payments on its behalf," while Jiang's declaration states that, on that date, "ITG was provided with the authorization by Peace Bird to deal with Grand Power Express International (China) Limited . . . as its agent to receive the advances for the customs fees, duties, and taxes that were paid by ITG on behalf of Peace Bird." Wang Decl. ¶ 36; Jiang Decl. ¶ 29. The declarations provide a copy of this authorization, executed only by Defendant Peace Bird, which is dated August 10, 2017, and states: "This proves that . . . Peace Bird Trading Corp. authorized Grand Power Express International (China) Limited . . . to do custom clearance and receive tax payment by LDP trading term of orders of Xiamen ITG Group Corp., Ltd." Ex. 4.

Neither of the declarations explain why an authorization from Defendants needed to be provided. Indeed, the LDP agreement executed between the parties in May 2017 already provided, according to one translation, that Plaintiff was authorized to operate as Defendants' agent. Ex. 3, at 1-3; Wang Decl. ¶ 31 (identifying LDP agreements as having been executed in May 2017). According to the certified translation, the LDP agreement stated that, under an LDP delivery term, the freight forwarder "is often controlled and designated by the seller themselves as the agent for procedures of overall customs clearance," and further stated: "we agree ITG to use their designated freight forwarder to operate the entire LDP customs clearance process." Ex. 3, at 4-6. These terms all apparently indicate that Plaintiff was responsible for arranging for and overseeing the payment of the customs and duties fees, and that Grand Power would be operating as *Plaintiff's* agent for

this process. It is unclear why the declarations apparently indicate that authorization was needed for Grand Power to operate as *Defendants'* agent for this process. Indeed, according to Jiang's declaration, Grand Power had already begun invoicing Plaintiff for the LDP customs and duties fees before this authorization was executed, with the first being received on August 7, 2017. *See* Jiang Decl. App. A. The submissions also do not account for the delay between Grand Power confirming "[i]n the latter part of July 2017" that it could process the payments and Grand Power generating the first invoice on August 7, 2017, nor which of the parties was responsible for setting up logistics with Grand Power to cause the invoices to begin to be generated and sent. Wang Decl. ¶ 35; Jiang Decl. App. A. Moreover, the authorization does not appear to actually have been necessary, as only Defendant Peace Bird executed this authorization, and the LDP shipment in Counterclaim Count 1 for Defendant Crystal Vogue was apparently processed without one. *See* Ex. 1-X1; Ex. 4.

While not explaining the reason why this authorization was needed, the declarations allege that Plaintiff began to remit payments to Grand Power for the LDP fees the day after it received the executed authorization from Defendant Peace Bird. Wang Decl. ¶¶ 36-37; Jiang Decl. ¶¶ 29-32. Thus, under the applicable LDP terms, as derived from both the LDP agreement and the applicable Sales Contracts, it is unclear whether Plaintiff took timely steps, or was responsible for taking timely steps, to arrange for the LDP payments to begin being processed through Grand Power as their designated freight forwarder, and thus whether Plaintiff was complying with its contractual obligations as alleged. With respect to the LDP payments that are alleged to have been remitted to Grand Power, the documentation contains a variety of discrepancies, but which only speak to the sum of damages, rather than liability, and thus need not be treated as true for purposes of this motion for default judgment.

- 16 -

IV.    **Procedural History.**

Plaintiff commenced this action on November 19, 2019, alleging twenty counts of breach of contract against Defendant Peace Bird. *See* Compl., ECF No. 1. On December 31, 2019, Defendant Peace Bird appeared and filed an Answer, joining Defendants Xing Lin and Crystal Vogue, collectively asserting five counterclaims. *See* Answer, ECF No. 9. On February 11, 2020, Plaintiff filed a Reply, answering the five counterclaims and asserting seven additional breach of contract claims against newly joined Defendants Xing Lin and Crystal Vogue. *See* Reply, ECF No. 15. On March 26, 2020, Defendants Xing Lin and Crystal Vogue filed a responsive pleading answering the seven additional breach of contract claims. *See* Answer to Reply, ECF No. 18. For the next two and a half years, discovery continued, was completed, and dispositive motion practice began. *See* Min. Entry, ECF No. 55; Mot. for Pre-Mot. Conference, ECF No. 56; Opp'n to Mot. for Pre-Mot. Conference, ECF No. 57; Proposed Br. Schedule, ECF No. 58.

Thereafter, on October 20, 2022, defense counsel filed a letter seeking to withdraw from the case due to non-payment. *See* Letter, ECF No. 59. Briefing on the pending motion for summary judgment was held in abeyance pending a decision on the request. *See* Docket Order dated Dec. 5, 2022. On April 14, 2023, the Honorable Dora Lizette Irizarry Ordered defense counsel to file a formal motion to withdraw with additional detail regarding the circumstances prompting the request. *See* Docket Order dated Apr. 14, 2023. On April 28, 2023, defense counsel filed a formal motion to withdraw, which was ultimately granted. *See* Mot. to Withdraw, ECF No. 62; Docket Order dated Nov. 8, 2023. Because Defendants are corporations, and thus must be represented by counsel in order to proceed in federal court, Defendants were given 45 days to obtain replacement counsel or risk an entry of default. *See* Docket Order dated Nov. 8, 2023. If no replacement counsel appeared by December 22, 2023, Plaintiff was granted leave to seek a certificate of default and to

subsequently file a motion for default judgment with the Court. *See id.* Defendants did not file an appearance through counsel by the deadline and, to date, still have not done so.

On January 3, 2024, Plaintiff requested a Certificate of Default from the Clerk of Court, and the Clerk entered default on January 17, 2024. *See* Req. Certificate Default, ECF No. 65; Entry of Default, ECF No. 66. Thereafter, on February 5, 2024, Plaintiff filed the instant motion for default judgment. Pl.'s Mot. Default J., ECF No. 67. The Honorable Dora Lizette Irizarry referred the motion to the undersigned for this Report and Recommendation. *See* Referral Orders dated Feb. 6, 2024.

## LEGAL STANDARD

### I.    Rule 55(b)(2) Standard.

Rule 55 of the Federal Rules of Civil Procedure calls for a two-step process for obtaining a default judgment. *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504-05 (2d Cir. 2011). First, the plaintiff must request entry of default by the Clerk of the Court. *Id.* (citing Fed. R. Civ. P. 55(a)). However, an entry of default at the first step "does not by definition entitle plaintiffs to an entry of a default judgment." *Bricklayers,* 779 F.3d at 187. Thus, once default has been entered against the non-responsive parties, the plaintiff "must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2); *see City of New York v. Mickalis Pawn Shop*, LLC, 645 F.3d 114, 128 (2d Cir. 2011) (describing two-step process).

Because "a default is an admission of all well-pleaded allegations against the defaulting party," in determining whether to enter a default judgment, the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Henry*, 108 F.4th at 55 (quoting *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)) (citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)). Then, the

court must determine whether these facts establish the defendants' liability as a matter of law. *Mickalis Pawn Shop, LLC*, 645 F.3d at 137; *see also Henry*, 108 F.4th at 55 ("[A] district court may not enter a default judgment unless the plaintiff's complaint states a valid facial claim for relief." (citations and quotations omitted)); *Priestley*, 647 F.3d at 506 (holding that complaint must allege facts that establish elements of cause of action). However, in examining the sufficiency of the complaint, the court does not credit conclusions of law. *Henry*, 108 F.4th at 55; *see also Priestley*, 647 F.3d at 506 (holding that conclusory allegations that are unsupported by factual allegations, or contradicted by alleged facts, are properly rejected). In conducting this inquiry, the burden of proof is on the plaintiff to demonstrate that "th[e] uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." *McDermott v. Light the Region Media LLC*, No. 6:23-CV-06094 EAW, 2023 WL 8656783, at *3 (W.D.N.Y. Dec. 15, 2023) (collecting cases); *Shum v. Jili Inc.*, No. 17CIV7600RPKVMS, 2023 WL 2974902, at *8 (E.D.N.Y. Mar. 19, 2023) (same).

Courts require that the complaint, and documents considered to be included in the complaint, facially state a claim without resort to extrinsic evidence. *Grp. One Ltd.,* F. Supp. 3d at 59 (collecting cases in which courts declined to consider evidence extrinsic to the pleadings in determining whether the allegations sufficiently stated a claim); *Flanagan*, 2015 WL 1042279, at *3 n.1 (collecting cases where courts considered, on motions for default judgment, documents that were incorporated by reference into, or integral to, the complaint in determining its legal sufficiency). This is because "[t]he essence of Fed. R. Civ. P. 55 is that a plaintiff can obtain from a default judgment equivalent relief to but not greater than that it would obtain in a contested proceeding assuming it prevailed on all of its factual allegations." *Henry*, 108 F.4th at 55 (quoting *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 367 (S.D.N.Y. 2020)). While the complaint must,

on its own, facially state a claim for relief, the court, in its discretion, may also investigate the basis for the facts alleged and require the submission of proof therefor. *Henry,* F.4th at 55; *see also Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 n.17 (2d Cir. 2015) (noting that court has discretion to investigate basis for plaintiff's allegations before deciding whether to grant default). Put another way, while the court treats the factual allegations in the complaint as true, the court can investigate or consider extrinsic evidence to satisfy itself that the factual allegations are, indeed, supportable by evidence. "Only after the district court is convinced that the facts meet the elements of the relevant cause of action—whether those facts are established by well-pleaded allegations or proven by admissible evidence—may the district court enter a default judgment." *Henry,* 108 F.4th at 55. Moreover, "[b]ecause defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether a default should be granted . . . , the doubt should be resolved in favor of the defaulting party." *Id.* at 51 (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993)).

Because the decision whether the enter a default judgment is discretionary, courts also separately examine several factors to determine whether to exercise such discretion. *Grp. One Ltd.*, 625 F. Supp. 3d at 60–61 (collecting cases separately examining whether the complaint facially stated a claim and the factors for whether to exercise discretion to enter default judgment); *Greathouse,* 784 F.3d at 116 ("The decision whether to enter default judgment is committed to the district court's discretion."). Specifically, to "determin[e] whether to grant a default judgment, the court looks to the same factors that apply to a motion to set aside a default judgment for good cause, namely: '(1) the willfulness of default, (2) the existence of any meritorious defenses, and (3) prejudice to the non-defaulting party.'" *Grp. One Ltd.*, 625 F. Supp. 3d at 54 (citations omitted); *Stokes v. MilkChocolateNYC LLC*, 681 F. Supp. 3d 226, 236 (S.D.N.Y. 2023) (same); *see also*

*Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 171 (2d Cir. 2001) (examining three factors for setting aside a default judgment to determine whether district court properly granted a default judgment).

Once a court has decided to enter a default judgment, the court must determine whether, and how much, to award in damages. *See Am. Builders*, 565 F. Supp. 3d at 343–44 (first deciding to enter default judgment before turning to question of damages); *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154–55 (2d Cir. 1999) (ruling that even when entry of default judgment is warranted, damages are not necessarily awarded); *Grp. One Ltd.*, 625 F. Supp. 3d at 80 (granting default judgment but deferring ruling on damages as insufficiently supported); *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527–28 (S.D.N.Y. 2012) ("Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award any damages, even though liability has been established through default." (collecting cases)); *Ningbo Yang Voyage Textiles Co. v. Sault Trading*, No. 18CV1961ARRST, 2019 WL 5399973, at *5 (E.D.N.Y. Sept. 10, 2019), *report and recommendation adopted*, No. 118CV1961ARRST, 2019 WL 5394568 (E.D.N.Y. Oct. 22, 2019) (describing the damages inquest as "a separate obligation"). Unlike allegations pertaining to liability, allegations in the complaint relating to damages are not deemed admitted upon entry of a default. *Bricklayers*, 779 F.3d at 189; *see also Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) ("[I]t is well established that '[w]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages.'" (citation omitted)). Instead, "[o]nce liability is determined, the plaintiff bears the burden of establishing an amount of damages with reasonable certainty." *Stokes*, 681 F. Supp. 3d at 236 (citing *Transatlantic*

*Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)). To do so, the court must "first determine[e] the proper rule for calculating damages on [the given] claim and then assess[] plaintiff's evidence supporting the damages to be determined under this rule." *McDermott*, 2023 WL 8656783, at *4 (quotations and citation omitted); *see also Credit Lyonnais*, 183 F.3d at 155. "There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers*, 699 F.3d at 234. "Regardless of the evidence presented, '[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.'" *Busrel Inc. v. Dotton*, No. 1:20-CV-01767, 2022 WL 16559446, at *7 (W.D.N.Y. Nov. 1, 2022) (quoting Fed. R. Civ. P. 54(c)); *see also Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007) ("By limiting damages to what is specified in the 'demand for judgment,' [Rule 54(c)] ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is willing to suffer judgment in that amount, and then default without the need to hire a lawyer."). Thus, the burden of proof is on the plaintiff to demonstrate entitlement to the damages requested. *J & J Sports Prods., Inc. v. Senor De Chalma Corp.*, No. 15CV6648ARRCLP, 2016 WL 7655800, at *4 (E.D.N.Y. Dec. 19, 2016), *report and recommendation adopted sub nom. J&J Sports Prods., Inc. v. Senor De Chalma Corp.*, No. 15-CV-6648(ARR)(CLP), 2017 WL 61937 (E.D.N.Y. Jan. 5, 2017).

## II.    Rule 41(b) Standard.

Rule 41(b) authorizes a district court to dismiss an action "[i]f the plaintiff fails to prosecute." Fed. R. Civ. P. 41(b). "Rule 41 applies with equal force 'to a dismissal of any counterclaim, crossclaim, or third-party claim.'" *Rsch. Found. for State Univ. of New York v.*

*Telluric Labs, LLC*, No. 21-CV-1898 (JS)(SIL), 2023 WL 6307995, at *6 (E.D.N.Y. Sept. 28, 2023) (quoting Fed. R. Civ. P. 41(c)). Because "corporation[s] may not appear in federal court *pro se*," *Kaplan v. Bank Saderat PLC*, 77 F.4th 110, 116 n.8 (2d Cir. 2023) (citing *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006)), a corporation cannot prosecute an action when the corporation fails to obtain replacement counsel following prior counsel's withdrawal. *Schwartzman v. Label, LLC*, No. 115CV05793VSBSDA, 2020 WL 1034373, at *1 (S.D.N.Y. Jan. 22, 2020), *report and recommendation adopted*, No. 15CV5793VSBSDA, 2020 WL 1033531 (S.D.N.Y. Mar. 3, 2020) (collecting cases); *Telluric Labs*, 2023 WL 6307995, at *6–7 (dismissing counterclaims of corporate defendant for failure to prosecute due to failure to obtain replacement counsel). Courts thus analyze counterclaims brought by unrepresented corporate defendants under the applicable Rule 41(b) framework. *Id.*

While "involuntary dismissal is an important tool for preventing undue delays and avoiding docket congestion," *U.S. ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 250–51 (2d Cir. 2004) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–31 (1962)), it is nevertheless a "harsh remedy" that should be reserved for "extreme situations." *Lewis v. Rawson*, 564 F.3d 569, 576 (2d Cir. 2009) (quoting *Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993)). Thus, the Second Circuit has established a five-factor test (sometimes referred to as the "*Drake*" factors) for determining whether involuntary dismissal is warranted pursuant to Rule 41(b). *Id.* The *Drake* factors examine whether:

> (1) the plaintiff's failure to prosecute caused a delay of significant duration; (2) plaintiff was given notice that further delay would result in dismissal; (3) defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and (5) the trial court adequately assessed the efficacy of lesser sanctions.

Case 1:19-cv-06524-DLI-ST    Document 68    Filed 08/30/24    Page 24 of 43 PageID #: 3562

*Id.* (quoting *Drake*, 375 F.3d at 254). "In making use of this test, [n]o one factor is dispositive, and ultimately [the Court] must review the dismissal in light of the record as a whole." *Id.* (quotations and citations omitted); *see also Heendeniya v. St. Joseph's Hosp. Health Ctr.*, 830 F. App'x 354, 357 (2d Cir. 2020).

## DISCUSSION

The Court will first address Plaintiff's motion for default judgment pursuant to Rule 55(b)(2), before proceeding to Plaintiff's motion to dismiss Defendants' counterclaims for failure to prosecute pursuant to Rule 41(b).

**I.    Plaintiff's Motion for Default Judgment Under Rule 55(b)(2) Should Be Denied Without Prejudice Because Plaintiff's Allegations Are Contradicted By Its Submissions, and Thus Do Not Adequately Establish Liability.**

Plaintiff's Complaint and Reply allege 27 breach of contract actions under the CISG. "[T]he CISG governs sales contracts between parties from different signatory countries," unless the parties exclude its application. *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 n.1 (2d Cir. 1995); *see also Transmar Commodity Grp. Ltd. v. Cooperativa Agraria Indus. Naranjillo Ltda.*, 721 F. App'x 88, 89 (2d Cir. 2018). Here, Plaintiff, the seller, is a Chinese corporation, and all three Defendants, as buyers, are American corporations. Compl. ¶¶ 2-3; Answer 43, ¶¶ 4-5. Both China and the United States are signatories to the CISG. *Ningbo Yang*, 2019 WL 5399973, at *2; *see also* CISG, art. 3 (listing both the United States and China as signatories). Moreover, none of the relevant documents exchanged between the parties in the relevant transactions contained any provisions mentioning choice of law. *See, e.g.*, Ex. 1-1A. Thus, the CISG governs the sales at issue.[15]

---

[15] To this end, the Court notes, *sua sponte*, that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. *Ningbo Yang*, 2019 WL 5399973, at *2; *see also Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F. Supp. 2d 426, 430 (S.D.N.Y. 2011) (collecting cases).

"A plaintiff asserting a breach of contract claim under the CISG must show: (1) the existence of a valid and enforceable contract containing both definite and certain terms, (2) performance by plaintiff, (3) breach by defendant and (4) resultant injury to plaintiff." *Ningbo Yang*, 2019 WL 5399973, at *3 (quotations and citation omitted). These elements are the same as those for breach of contract under New York law. *Id*; *Busrel*, 2022 WL 16559446, at *8; *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, No. 21 CIV. 859 (NRB), 2022 WL 540756, at *2 (S.D.N.Y. Feb. 23, 2022).

The problem, on the instant motion, is that Plaintiff's pleadings and submissions contradict, and, at times, even negate these elements. For example, with respect to the first element, the contracts for Counts 4 and 5, and Counterclaim Counts 4, 5, 6, and 7, are not signed by the purchasing Defendant.[16] *See, e.g.*, Ex. 1-5. Under the CISG, this would not necessarily preclude the existence of a valid and enforceable contract, as it does not contain a statute of frauds provision or a parol evidence rule. To be sure, Article 11 of the CISG states that "[a] contract . . . need not be concluded in or evidenced by writing and is not subject to any other requirement as to form. It may be proved by any means, including witnesses." CISG, art. 11; *see also Claudia v. Olivieri Footwear Ltd.*, No. 96 CIV. 8052 (HB)(TH), 1998 WL 164824, at *5 (S.D.N.Y. Apr. 7, 1998) (collecting scholarly articles analyzing permissibility of parol evidence under the CISG). Thus, on default, the existence of an oral contract could be established via factual allegations describing the content of such conversations, which would be deemed true. Namely, these factual allegations would need to establish offer and acceptance, both of which are necessary under the CISG to consummate a valid and enforceable contract. CISG, art. 14(1) ("A proposal for concluding a

---

[16] Based upon the submissions for Counterclaim Count 4, the orders for item numbers SPT003, SPT004, SPT005, and SPT006 were all placed via one writing. Despite the contracts appearing to be identical, the copies of the contract submitted as exhibits for SPT003, SPT004, and SPT005 are unsigned, but the copy of the contract submitted as an exhibit for SPT006 is signed. This discrepancy is not explained. *See* Ex. 1-X4A; Ex. 1-X4B; Ex. 1-X4C; Ex. 1-X4D.

contract addressed to one or more specific persons constitutes an offer if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance."); CISG, art. 18(1) ("A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance."); CISG, art. 18(2) ("An acceptance of an offer becomes effective at the moment the indication of assent reaches the offeror."); CISG, art. 23 ("A contract is concluded at the moment when an acceptance of an offer becomes effective in accordance with the provisions of this Convention.").

However, Plaintiff does not allege that the parties entered into an oral contract. Rather, for every count, Plaintiff alleges that the parties "entered into a *written* Sales Contract." *See, e.g.*, Compl. ¶ 79 (emphasis added).[17] Plaintiff's allegation that Defendants entered into a contractual relationship is a legal conclusion, rather than a factual allegation that Defendants assented to the bargain by agreeing to purchase specific products, or describing the circumstances or method through which they may have assented (*i.e.*, telephone call, email, etc.), and thus is not properly credited on a motion for default judgment. That said, neither it, nor the unsigned Sales Contracts, establish that Defendants assented to the terms (whether as offeror or offeree), thus creating a valid and enforceable contract.

While mentioning consent, the Complaint's introductory allegations, which are repeated and realleged for each claim,[18] do not cure this deficiency. Specifically, Plaintiff alleges that, in the written Sales Contracts, Plaintiff "agreed to sell, and [Defendants] agreed to buy" the various fabrics and textiles. Compl. ¶ 6; *see also id.* ¶ 20 (repeating and realleging paragraphs 1 through 19 for Count 1). This allegation is contradicted by the copies of the Sales Contracts that

---

[17] Plaintiff's pleadings are formulaic, in that the allegations for each count mirror one another. Thus, throughout this discussion, the Court will often cite to one instance exemplifying a point being discussed, rather than citing every observable instance.

[18] Note, however, that the introductory allegations appear only to have been repeated and realleged for the 20 counts against Defendant Peace Bird. The Reply, which asserts the Counterclaims against Defendants Xing Lin and Crystal Vogue, do not contain these allegations nor do they incorporate or reference them therein.

Plaintiff submitted, because they contain no signature or stamp indicating that Defendant did agree to the terms. Thus, for Counts 4 and 5, and Counterclaim Counts 4, 5, 6, and 7, neither Plaintiff's pleadings nor the documents integral to them establish offer and acceptance for the first element— the existence of a valid and enforceable contract.[19] *Ningbo Yang*, 2019 WL 5399973, at *3 (quotations and citation omitted).

Plaintiff also fails to address the validity, enforceability, and application of the LDP Agreement. As an initial matter, the LDP Agreement is a separate writing, which is *not* a contract for the sale of goods. Thus, it is not immediately clear whether the CISG is even applicable to it, nor does Plaintiff address whether it is. Moreover, Plaintiff does not present argument regarding how the Court should address the interrelation of separate writings under the CISG or the application of one writing to another, such as in the circumstances presented here, nor whether the LDP Agreement is integral to the pleadings, since Plaintiff does not bring a breach of contract action for breach of the LDP Agreement. Moreover, it is unclear whether the LDP Agreement is a valid and enforceable contract containing definite and certain terms allowing for a determination of the "price," *see* CISG, art. 14(1), since Plaintiff's own submissions apparently disagree regarding what the "price" term says.

---

[19] Plaintiff's pleadings never mention the Letters of Payment Guarantee exchanged between the parties. While contracts are integral to complaints alleging breach of contract, the Plaintiff alleges that the Sales Contracts are the contracts giving rise to the breach of contract actions. *See, e.g.*, Compl. ¶¶ 37-41. Plaintiff's non-reliance on the Guarantees is further evidenced by the fact that, for the counts where the totals of the Commercial Invoices and the Guarantees, differ, Plaintiff pleads damages matching the totals of the Commercial Invoices, not the Guarantees. *See, e.g.*, Compl. ¶¶ 165, 168; Ex. 1-11A; Ex. 1-11B. Thus, it is unclear whether, and Plaintiff makes no argument that, the Guarantees are integral to the pleadings or properly considerable for liability for breach of contract actions brought for breach of the Sales Contracts. *Grp. One Ltd.*, 625 F. Supp. 3d at 59 n.16 (collecting cases refusing to consider extrinsic evidence in determining whether complaint facially states a claim); *Flanagan*, 2015 WL 1042279, at *3 n.1 (collecting cases only considering documents integral to or incorporated by reference into complaint). Even if they were, for Counts 4 and 5, there are no Guarantees. *See, e.g.*, Ex. 1-5. In any event, the Guarantees do not contain important terms, such as quantities and unit prices. *See, e.g.*, Ex. 1-X7; CISG, art. 14(1) ("A proposal for concluding a contract . . . constitutes an offer if it is sufficiently definite . . . . A proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price."). Plaintiff has presented no argument under the CISG to address or resolve these issues.

First, Plaintiff's Complaint alleges that, under the LDP Agreement, the parties agreed that Plaintiff would be reimbursed for "the full amount of the customs' fees, duties and taxes advanced by [Plaintiff], together with interest at the rate of 4% from the date each such payment was advanced by Plaintiff," and agreed that "the amount of the fees, duties and taxes . . . would be included in the purchase price of the items sold." Compl. ¶¶ 16-17. The LDP Agreement that Plaintiff submitted in support of its motion for default, however, was written in both English and Chinese, and neither the English nor Chinese provisions contain these terms. Rather, the relevant English provision in the agreement stated that Defendants "agree[d] pay 4% more for the cost which XIAMEN ITG GROUP CO.,LTD prepared us for the LDP cost," and the relevant Chinese provision stated that Defendants "agree[d] to pay ITG 4% more of the customs clearance fee as a reward for ITG to advance the LDP cost for us."[20] Ex. 3. Neither provision mentions the word "interest," sets any dates on which interest would begin to accrue or how it would be calculated, nor states that the fees would be included in the purchase price of the items sold. Indeed, it appears to provide for a 4% flat sum, not accruing interest. While extrinsic evidence, including oral conversations during negotiations, can be considered to determine the intended agreement under the CISG, even when this parol evidence contradicts the written document, *see Claudia*, 1998 WL 164824, at *5, Plaintiff does not address this contradiction, and appears to allege that the parties agreed in writing, not an oral discussion, to 4% interest. Specifically, Plaintiff alleges that the 4% interest is provided for "under their LDP Agreement." Compl. ¶ 16. The agreement, however, does not provide for this, and Plaintiff has presented no argument explaining how Plaintiff's uncontroverted evidence (namely, the terms of the LDP Agreement that Plaintiff submitted) is consistent with the allegation in the Complaint.

---

[20] For the full text of both the English and Chinese terms of the agreement, see Background, Part II, *supra*.

For the second element of a breach of contract action under the CISG, Plaintiff must show that it satisfactorily performed in accordance with the agreement. This element is also contradicted by the allegations in Plaintiff's pleadings, as well as the documents integral to them. For eleven claims, Plaintiff's uncontroverted allegations establish that the items were delivered late.[21] Indeed, in some instances, the items were delivered several months after the deadline imposed by the contract. *Compare* Reply 30, ¶ 42 ("The Sales Contract provided that . . . customer item number SPT006 was to be shipped out of any port in China before February 15, 2017."), *with* Reply 34, ¶ 66 ("On May 23, 2017, customer item number SPT006 . . . was shipped-on-board from Ningbo, China."). While Plaintiff alleges, for all counts, that "Plaintiff ITG, has, at all times, performed its obligations under the Sales Contract," this allegation is a threadbare recital of the second element of the cause of action, and is plainly contradicted by the well-pleaded factual allegations in Plaintiff's pleadings. *See* Reply 35, ¶ 69; *see also Henry*, 108 F.4th at 58 (rejecting allegations in complaint that were threadbare recitals of the elements of the causes of action). These threadbare recitals of the causes of action do not constitute well-pleaded factual allegations for purposes of a default judgment. *See Henry*, 108 F.4th at 58; *Priestley*, 647 F.3d at 506 (reversing entry of default judgment because the factual allegations contradicted the threadbare legal conclusion alleged in the complaint). Instead, the well-pleaded factual allegations which the Court must credit (and which are, indeed, correct per the copies of the documents submitted) are those establishing that the parties agreed that deliveries would occur by certain dates, but that those deliveries ultimately did not occur by those dates.[22] *See Priestley*, 647 F.3d at 506.

---

[21] The claims are as follows: Counts 1 (for the first shipment), 6, 8, 9, and 10, and Counterclaim Counts 1, 2, 3, 4, 5, and 7.

[22] Again, as with the first element, the Letters of Payment Guarantee do not cure these deficiencies. First, they are likely not integral to the pleadings, as the pleadings do not allege breach of the Guarantees as the contract (indeed, as discussed, Plaintiff's plead damages do not match the sums of the Guarantees). Since they are never mentioned in the pleadings, they are also not incorporated by reference therein. Even if they were integral, for two of the late deliveries, no Guarantees were exchanged. *See* Ex. 1-6; Ex. 1-X1. For two others, the Guarantees were executed by a different

An examination of the Sales Contracts integral to the pleadings further contradicts the allegation that "Plaintiff ITG, has, at all times, performed its obligations under the Sales Contract." *See* Compl. ¶ 32. For example, the shipments for several of the contracts provided terms for quantity, but which allowed for upward or downward deviations of 3%, 5%, or 10%. *See, e.g.*, Ex. 1-3; Ex. 1-5; Ex. 1-7. However, for at least 10 claims, Plaintiff shipped amounts that were either over, under, or both over and under, the permissible deviations according to the contracts.[23] *See, e.g.*, Ex. 1-3.

For contracts that do not provide terms allowing for deviations, the shipments almost never conformed to the exact weight ordered, presumably because this is very difficult to achieve. Thus, a reasonable interpretation under the CISG would presumably excuse minor, technical breaches in weight. *See* CISG, art. 9(1) ("The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves."). Indeed, an examination of the record reveals that, when the parties did provide for deviation, they most frequently agreed to a permissible deviation of 5%. However, even among the contracts for which the terms apparently did not permit any deviation, for at least five of these contracts, Plaintiff sent quantities that deviated by 5% or more.[24] *See, e.g.*, Ex. 1-12B. Thus, for fifteen claims, Plaintiff apparently breached by sending incorrect quantities, and thus the documents integral to the pleadings contradict Plaintiff's conclusory allegation that Plaintiff, at all times, performed its obligations under the contracts.

---

Defendant (*i.e.*, someone other than the buyer). *See* Ex. 1-X2; Ex. 1-X3. Moreover, as discussed, Plaintiff has not addressed the Guarantees' missing terms.

[23] Specifically, Counts 3, 4, 5, 7, 8, 9, and Counterclaim Counts 2, 4 (for three of the four shipments), 5 (for the first shipment), and 7. For a more detailed comparison of quantities ordered and shipped, see Background, Part II, *supra*.

[24] These Counts are 12 (for two shipments), 13 (for the second shipment), 15 (for the first shipment), 17 (for the first shipment), and 20.

- 30 -

Plaintiff's submissions raise a multitude of other questions in terms of incorrect totals charged,[25] items that were ordered but apparently did not ship,[26] unexplained differences between the Commercial Invoice totals and the totals in the Letters of Payment Guarantee,[27] an apparent missing shipment for an item,[28] among other problems. The major remaining question with respect to whether the pleadings establish liability, however, is whether Plaintiff complied in remitting the LDP payments. As discussed, Plaintiff alleges in the Complaint that it remitted the LDP fees for the relevant shipments. Compl. ¶ 18. Although this allegation is vague and does not provide any detail regarding dates remitted, methods of remittance, or other pertinent information (all of which may limit the recovery of damages under FRCP 54(c) which limits recovery on default to the damages established in the complaint), the Court, for purposes of whether to enter a default judgment, accepts this allegation as true. Plaintiff's submissions, however, call into question whether Plaintiff *timely* remitted these payments.

The Court has reviewed in detail the content of Plaintiff's submissions, which total more than 1,000 pages in length, including the submissions that detail the background behind the parties' decisions and steps taken in entering into the LDP Agreement. *See* Background, Part III, *supra*. To summarize, without belaboring the point, the affidavits submitted by Plaintiff in support of this motion indicate that Defendants, rather than Plaintiff, took the steps necessary to locate a freight forwarder who was able to process the LDP payments. In the interim, Plaintiff began sending out shipments before the freight forwarder had officially been put in place to perform these services. From the submissions, it is unclear who made the decision to proceed with the shipments before

---

[25] Count 4, customer item number OCC-0079. *See* Background, Part II, *supra*.
[26] Count 1, customer item number LYM033; Count 4, customer item numbers OCC-0076-DP, OCC-0080-DP, and OCC-0078-Z; Count 6, customer item numbers PFPFD003 through PFPFD006; Count 7, customer item numbers PFPDB003 through PFPDB006; as well as Counterclaim Counts 2, 3, 4, 6, and 7. *See* Background, Part II, *supra*.
[27] Counts 11, 12, 13. 14, and 15. *See* Background, Part II, *supra*.
[28] Count 9, for customer item number WD001-1. *See* Background, Part II, *supra*.

the freight forwarder was in place. These events occurred against the backdrop of an LDP Agreement according to which the onus appears to have been on Plaintiff, not Defendants, to facilitate the LDP process, which steps it appears Plaintiff may not have been diligently taking. Moreover, the submissions indicate that Plaintiff was awaiting an authorization from Defendants to allow them to work with the freight forwarder before they began processing the payments. It is unclear, however, why this authorization was necessary, as the LDP Agreement itself seemingly already provided such authorization, and one LDP payment was processed for Defendant Crystal Vogue, who never executed such authorization. Thus, while the Court credits as true Plaintiff's allegation that it made the LDP payments (and, indeed, the submissions confirm this), Plaintiff's submissions call into question whether these obligations were timely performed.

As noted above, a non-defaulting party is not automatically entitled to the entry of default judgment, *see Bricklayers*, 779 F.3d at 187, but rather bears the burden of establishing their entitlement thereto. *McDermott*, 2023 WL 8656783, at *3 (collecting cases); *Shum*, 2023 WL 2974902, at *8 (same). To that end, a plaintiff's complaint must contain *well-pleaded* facts which, when accepted as true, establish the requisite elements of the cause of action, *Mickalis Pawn Shop*, 645 F.3d at 137; *Henry*, 108 F.4th at 55; *Priestley*, 647 F.3d at 506, without resort to extrinsic evidence beyond the pleadings. *Grp. One Ltd.*, 625 F. Supp. 3d at 59 n.16; *Flanagan*, 2015 WL 1042279, at *3 n.1; *cf. Henry*, 108 F.4th at 55 n.5. Moreover, when doubt exists about whether to enter a default judgment, such doubts are resolved in favor of the defaulting party. *Henry*, 108 F.4th at 51 (quoting *Enron Oil*, 10 F.3d at 96).

Given the above, the Court cannot say that Plaintiff has met its burden of showing that the pleadings facially state a claim for liability. Notably, the Second Circuit has held that factual allegations that contradict the elements of a cause of action preclude the entry of default judgment.

*Priestley*, 647 F.3d at 506. Moreover, courts routinely hold that alleged facts that are contradictory or inconsistent are not "well-pleaded" and should not be credited. *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405–06 (collecting cases); *Freedom Mortg. Corp. v. Bullock*, No. 19-CV-664-NGG-SJB, 2022 WL 18299810, at *2 (E.D.N.Y. Mar. 11, 2022), *report and recommendation adopted*, No. 19CV664NGGSJB, 2022 WL 4445399 (E.D.N.Y. Sept. 23, 2022); *Lin v. Quality Woods, Inc.*, No. 17-CV-3043-DLI-SJB, 2021 WL 4129151, at *7 (E.D.N.Y. Aug. 10, 2021). Indeed, courts have even held that alleged facts are not "well-pleaded" when contradicted by extrinsic evidence submitted by the plaintiff. *See J & J Sports*, 2016 WL 7655800, at *4 (collecting cases); *Glob. Auto, Inc. v. Hitrinov*, No. 13CV2479PKCRER, 2021 WL 7367078, at *5 (E.D.N.Y. Aug. 20, 2021), *report and recommendation adopted*, No. 13CV2479PKCRER, 2022 WL 593613 (E.D.N.Y. Feb. 28, 2022) (collecting cases).

Simply put, "[a] default does not . . . excuse any defects in the plaintiffs' pleading." *Freedom Mortg. Corp.*, 2022 WL 18299810, at *2 (citation omitted). Moreover, with respect to the adequacy of the motion itself, courts often deny motions for default judgment without prejudice to allow parties to correct procedural deficiencies or brief inadequately briefed substantive issues. *See, e.g.*, *Romualdo v. Guru Krupa 104 Corp.*, No. 19-CV-5188-DG-SJB, 2023 WL 6167614, at *9 (E.D.N.Y. Sept. 1, 2023); *Saavedra v. Dom Music Box Inc.*, No. 21-CV-6051, 2024 WL 208303, at *2–3 (E.D.N.Y. Jan. 19, 2024).

In light of the various ways in which Plaintiff's allegations are internally contradictory, and contradicted by the evidence submitted, in ways which speak directly and necessarily to the elements of the cause of action, the Court has doubts, that it must resolve in favor of the defaulting party, with respect to whether entry of default judgment is appropriate in this case. While the issues discussed above do not impact all of the causes of action in this case, they are pervasive enough to

make it impractical to bifurcate the claims.[29] Moreover, for many of the same reasons discussed above, and especially with respect to the LDP Agreement, even if the Court were to find the entry of default judgment appropriate, the Court would not be satisfied, with reasonable certainty, that Plaintiff has met its burden of proof in establishing the alleged damages. *Stokes*, 681 F. Supp. 3d at 236 (citing *Transatlantic Marine*, 109 F.3d at 111). Thus, the Court respectfully recommends that Plaintiff's motion for default judgment be denied without prejudice.

Should Plaintiff file a new motion for default judgment, the new motion should also address the following concerns with respect to a damages award. First, Plaintiff should address why the Court should interpret the LDP Agreement to provide for 4% interest, rather than a 4% flat rate, despite the language in the agreement and the various concerns, as previously noted, about the practice of "burying" the cost of the LDP fees in the amount charged for the items ordered. Specifically, Plaintiff should address the permissibility of this practice and how, given that practice, the parties planned to track and ascertain the accrual of interest in order for Defendants to determine how much they owed.

Second, assuming the LDP fees are appropriately subject to 4% accruing interest, Plaintiff should address how the practice of "burying" the fees in the invoice totals impacts any damages award in light of Rule 54(c). *Busrel*, 2022 WL 16559446, at *7 (quoting Fed. R. Civ. P. 54(c)) ("Regardless of the evidence presented, '[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.'"); *see also Silge*, 510 F.3d at 160 ("By limiting damages to what is specified in the 'demand for judgment,' [Rule 54(c)] ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is willing to suffer judgment in that amount, and then default without the need to hire a lawyer.").

---

[29] Count 2 appears to be the only claim unaffected by the above analyses.

Specifically, Plaintiff's pleadings make no mention of the amounts paid for LDP fees, presumably because the sales documents exchanged between the parties do not mention these sums. Thus, from a review of the pleadings, one cannot readily determine how much of the damages alleged for each count should be subject to 4% interest (the LDP portions of the totals), and how much should be subject to a standard rate of prejudgment interest (the goods portions of the totals).

Third, Plaintiff's submissions with respect to the amounts charged for orders are contradictory or unclear in several key respects that should be resolved. For Count 9, for customer item number WD001-1, Plaintiff should address why the Complaint alleges $152,258.82 in damages when the invoiced total only amounted to $106,326.22. The affidavits submitted in support of Plaintiff's motion list a separate line item for this count in the amount of $45,932.60 which would account for the difference, but which is unexplained and unaccounted for. Janiec Decl. ¶ 18; Wang Decl. ¶ 40. For Count 4, as discussed in Background, Part II, *supra*, the prices charged for the shipped items are incorrect per the amounts detailed in the Sales Contract.

For the LDP payments, Plaintiff's own submissions contradict one another multiple times. For example, for customer item numbers WD001-1 and MESH001-1, which were shipped under bill of lading number YMLUC232013344, Plaintiff received two invoices from Grand Power, the freight forwarder, designating this bill of lading number, in amounts of $24,000 and $40,000, thus totaling $64,000. *See* Ex. 6. One of the two charts submitted with Jiang's declaration matches this amount, and attributes it to the above bill of lading number, as well as Commercial Invoice number 17458YFM99BM100A. *See* Jiang Decl. App. A. Jiang's other chart, however, lists the LDP amount paid for WD001-1 and MESH001-1 as $47,000, rather than $64,000, despite attributing it to that same invoice number. Jiang Decl. ¶ 33. By contrast, Janiec's declaration lists WD001-1 and MESH001-1 individually, and states that the invoiced amount for each was $106,326.22 and

$62,897.30, respectively. Janiec Decl. ¶ 18. These sums match the amount for each of these items as invoiced in the same Commercial Invoice number that Jiang twice identifies. *See* Ex. 1-9, at 3. Thus, there can be no doubt that Janiec's declaration is referring to the shipment of WD001-1 and MESH001-1 that was shipped under bill of lading number YMLUC232013344. However, Janiec's declaration identifies the LDP fees for these items as $40,000 and $47,000, respectively, thus totaling $87,000. *See* Janiec Decl. ¶ 18. This total is plainly contradicted by the invoices that the freight forwarder, Grand Power, submitted, which designate the bill of lading number that they correspond with, and which indicate that that bill of lading number was invoiced under two Grand Power invoices, which together totaled $64,000.

Other discrepancies include the fact that, in Janiec's declaration, the mysterious second shipment for WD001-1 in the amount of $45,932.60 is identified as having no LDP charges. Janiec Decl. ¶ 18. Meanwhile, Jiang's LDP charts twice list the second WD001-1 order, for one chart on its own, and for one chart together with an unknown item never mentioned in any of the filings (AYR069-P), and list it as totaling $40,000 and $47,000, respectively. Jiang Decl. ¶ 33, App. A. The Grand Power invoice charged $47,000 for the bill of lading that these charts apparently attribute this item as relating to.

Moreover, Plaintiff alleges to have made six lump sum payments, on five separate days, for the LDP fees. Janiec's declaration lists the payments made on August 24, 2017, and September 22, 2017, for items at issue in this action, as totaling $396,000 and $121,000, respectively. Janiec Decl. ¶ 19. The $396,000 sum matches one of Jiang's charts, *see* Jiang Decl. ¶ 33, but not the other, *see* Jiang Decl. App. A. The $121,000 sum also matches only one of Jiang's charts, but in reverse. *See* Jiang Decl. ¶ 33 (totaling $121,000); Jiang Decl. App. A (totaling $138,000). Janiec's declaration also details the total amount of LDP fees advanced for orders related to this action as

equaling $960,000, *see* Janiec Decl. ¶ 19, however, Wang's declaration states that the $960,000 sum includes amounts already awarded in the CIETAC arbitrations. Wang Decl. ¶ 38.

Also, with respect to these payments, Jiang's declaration is internally contradictory. For example, one of Jiang's charts lists the third LDP payment as being for $102,000, but attributes it to three items (DXB097, BB1027, and DXDB004) which together only total $100,000, and lists the fourth payment as being for $100,000, but attributes it to three items (PS1028, PS1029, and DXB086) which total $102,000. Jiang Decl. ¶ 33. Jiang further alleges that some unspecified portion of the third payment for $102,000 was for items that were arbitrated before CIETAC. Jiang Decl. ¶ 33 ("The 3rd, 6th, and 7th payments also included advances that were made by ITG for shipments that were included in the CIETAC arbitration."). By contrast, Jiang's other chart attributes the three items identified for the latter payment to the former payment, and the three items identified for the former payment to the latter payment (*i.e.*, it reverses the items attributed to the respective payments). Jiang's declaration also does not allege that the sixth payment for $450,000 included advances for shipments included in the CIETAC arbitrations, but the items attributed to that payment in each of Jiang's charts fail to account for $54,000 and $47,000, respectively. Jiang Decl. ¶ 33, App. A. Finally, while Jiang's factual allegations allege that some unspecified portion of the seventh payment, for $138,000, was for items arbitrated before CIETAC, *see* Jiang Decl. ¶ 33, Jiang's second chart attributes all $138,000 of that payment to items at issue in this case (while the first chart does not). Jiang Decl. App. A.

Plaintiff should also address the extent to which the arbitrations may have already awarded sums at issue in this action, including the fact that the Peace Bird arbitration award adjudicates a transaction identified by the same contract number as one at issue in this case (NLF20170706, Count 9) and the fact that the bill of lading number that Jiang identifies for the combined shipment

for WD001-1 and AYR069-P matches the bill of lading number for contract number NLF20170620, as awarded in the CIETAC arbitration. *See* Ex. 5-B. Specifically, Plaintiff should address whether the multiple mentions of a second shipment of WD001-1 totaling $45,932.60 were already awarded.

Finally, Plaintiff should address the Grand Power invoices submitted for LDP fees and explain why, for multiple shipments, there are multiple invoices (either two or four installments), all with the same totals and with the same bill of lading number. *See* Jiang Decl. App. A. It is unclear that these are intended to be segmented increments added together, as alleged, rather than duplicates that were being reinvoiced multiple times. For Grand Power invoice numbers 00492585, 00492586, and 00492587, Plaintiff should address why they were attributed to item numbers LYM031, PFPFD002, and PFPDB002, when the bill of lading numbers identified on the invoices do not match any identifiable numbers on the bills of lading for those items. *See* Jiang Decl. App. A.

## II.    The Court Should Dismiss Defendants' Counterclaims Pursuant to Rule 41(b) Because Defendants Have Failed to Prosecute Their Claims for Two Years.

In contrast to Plaintiff's motion for default judgment, the Court has sufficient information to evaluate Plaintiff's motion to dismiss Defendants' counterclaims for failure to prosecute. In this case, Defendants' counterclaims should be dismissed for failure to prosecute.

As detailed above, courts review the five *Drake* factors in deciding whether dismissal for failure to prosecute pursuant to Rule 41(b) is appropriate. The first factor, whether the claimant's failure to prosecute caused a delay of significant duration, "breaks down into two parts: (1) whether the failures to prosecute were those of the [claimant], and (2) whether these failures were of significant duration." *Drake*, 375 F.3d at 255. With respect to the latter, while "[t]here is no fixed period of time that must elapse before a [claimant's] failure to prosecute becomes substantial

enough to warrant dismissal," multiple cases have held that "[d]elays of several months have been found to warrant dismissal." *See Caussade v. United States*, 293 F.R.D. 625, 629 (S.D.N.Y. 2013) (collecting cases). Indeed, dismissal may be proper after as few as three months, particularly in circumstances where the claimant has become unreachable. *Id.* (collecting cases)*; see also Lopez v. Cath. Charities of Archdiocese of New York*, No. 00-CIV-1247, 2001 WL 50896, at *3 (S.D.N.Y. Jan. 22, 2001) (dismissing case under Rule 41(b) where claimant "failed to take *any* steps to prosecute this action for at least three months" (emphasis in original)).

Here, Defendants, as corporations, must be represented by counsel in order to proceed in this action. *Kaplan*, 77 F.4th at 116 n.8; *Telluric Labs*, 2023 WL 6307995, at *6. Because Defendants' counsel has withdrawn and Defendants have failed to retain alternate counsel, Defendants have effectively become unreachable. As counsel's motion to withdraw was granted on November 8, 2023, this has persisted for almost ten months, but it appears that Defendants' involvement in this action ceased for at least a year before that point, pending the decision on counsel's motion to withdraw. Courts have held that durations of a year, and even of six months, sufficiently weigh in favor of dismissal for unrepresented corporations. *See Telluric Labs*, 2023 WL 6307995, at *6 (collecting cases). Moreover, Defendants' withdrawal from this action and failure to obtain replacement counsel appears to be willful. Thus, the failure to prosecute was that of the claimant, and both aspects of the first *Drake* factor weigh in favor of dismissal.

For the second factor, whether the claimant was given notice that further delay would result in dismissal, Defendants were warned, both by counsel and by the Court, that, as corporations, they were unable to proceed in federal court without counsel. These warnings did not specifically indicate that their claims may be subject to dismissal for failure to prosecute, and instead mentioned default judgment. Nevertheless, the warnings did communicate that Defendants would

be unable to engage in proceedings if counsel was not obtained. Thus, the warnings put Defendants on notice of some of the consequences contemplated by this factor, but perhaps not all. The second *Drake* factor is thus neutral.

The third factor, whether Plaintiff is likely to be prejudiced by further delay, also militates in favor of dismissal. A "presumption of prejudice is particularly appropriate where. . . the [claimant's] delay was 'prolonged.'" *See William v. City of New York*, 771 F. App'x 94, 95 (2d Cir. 2019) (quoting *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 195 (2d Cir. 1999)). To that end, "when a [claimant] offers no reasonable excuse for the delay, prejudice to the [respondent] is presumed because, as litigation drags on, evidence can be lost and discovery becomes more difficult." *Montanez-Garcia v. City of New York*, 2018 U.S. Dist. LEXIS 106807, *5-6 (S.D.N.Y. June 25, 2018) (citing *Sanders v. Doe*, No. 05CV7005, 2008 U.S. Dist. LEXIS 40515, at *12 (S.D.N.Y. May 8, 2008)). More specifically, "[w]here a [claimant] has become inaccessible for *months at a time*, courts presume prejudice." *Caussade*, 293 F.R.D. at 630 (collecting cases) (emphasis added).

Here, there does not appear to be any specific prejudice with respect to the progression of the discovery process because discovery in this action is already complete. Nevertheless, the evidence that Plaintiff obtained or intended to utilize may degrade over time, such as if intended witnesses become unavailable. Thus, the Court presumes prejudice given the prolonged delay. *See Telluric Labs*, 2023 WL 6307995, at *7 (presuming prejudice for counterclaims of corporate defendant due to prolonged delay). Moreover, and as discussed, Defendants here effectively become unreachable for a prolonged period. Thus, the third *Drake* factor weighs in favor of dismissal.

The fourth *Drake* factor, which requires courts to carefully balance expediency and the rights of the plaintiff, is neutral with respect to dismissal. In examining the fourth factor, courts must strike the proper "balance" between alleviating excess cases on the docket and the litigant's right to be heard. Specifically, courts look at whether a litigant has been given an opportunity "to be heard on the issue of failure to prosecute," *Martens v. Thomann*, 273 F.3d 159, 182 (2d Cir. 2001), and consider the plaintiff's "interest in prosecuting [his] case." *See Caussade*, 293 F.R.D at 631. "The Second Circuit has cautioned that [a] court must not let its zeal for a tidy calendar overcome its duty to do justice." *Id.* at 631 (quotations and citations omitted). "Nonetheless, fairness to other litigants, whether in the same case or merely in the same court as competitors for scarce judicial resources[,] may require a district court to dismiss a case pursuant to Rule 41(b)." *Id.* (quotations and citations omitted). To that end, "[d]ismissal is warranted where there is a lack of due diligence in the prosecution of the lawsuit by [the claimant]." *West v. City of New York*, 130 F.R.D. 522, 524 (S.D.N.Y. 1990) (citing *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982)).

Here, Defendants were warned in November 2023 that they must obtain replacement counsel but, to date, have failed to do so. Defendants did not seek to be heard on this issue. Moreover, despite Plaintiff having filed the instant motion seeking dismissal for failure to prosecute and serving such motion on Defendants, *see* ECF No. 67-65, Defendants have not opposed the motion or sought to be heard on it. Thus, despite having ample opportunity to be heard, Defendants have not expressed interest in prosecuting (or, perhaps, ability to prosecute) this case. Indeed, it appears that the reason for Defendants' failure to prosecute is that Defendants exhausted the funding needed to defend Plaintiff's claims against them. *See* Mot. to Withdraw ¶ 4, ECF No. 62. While Defendants have had ample opportunity to be heard, dismissing Defendants'

claims likely does little to relieve the Court's docket to preserve scarce judicial resources for other litigants at this juncture because this action, with respect to Plaintiff's claims, may still proceed. *But see Telluric Labs*, 2023 WL 6307995, at *7 (finding that dismissal of corporate defendant's counterclaims would preserve resources because court devoted "considerable time tending to th[e] case, particularly issues stemming from [the defendant's] representation"). Thus, the fourth *Drake* factor is neutral.

The fifth *Drake* factor, the adequacy of lesser actions, also weighs in favor of dismissal. "The final factor pertains to whether lesser sanctions would have been sufficient to remedy any prejudice resulting from [the claimant's] delay." *Caussade*, 293 F.R.D. at 631 (quotations and citations omitted). However, "district courts are not required to exhaust possible lesser sanctions before imposing dismissal or default if such a sanction is appropriate on the overall record." *Id.* (quoting *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 148 (2d Cir. 2010)). Moreover, "[c]ourts consistently find that dismissal is the only adequate remedy for failure to prosecute where a [claimant] cannot be contacted because the [claimant] would be unaware of any lesser sanction that could be imposed." *Id.* (collecting cases).

There does not appear to be any lesser sanction that could be imposed which would resolve Defendants' monetary obstacle in failing to retain alternate counsel. Indeed, the only lesser sanction presumably available is further delay. This, however, does not remedy the prejudice to Plaintiff, as described above, caused by Defendants' delay. Thus, such a lesser remedy cannot be considered sufficient. Thus, the fifth *Drake* factor weighs in favor of dismissal.

Having weighed all five *Drake* factors, the Court finds that the first, third, and fifth factors weigh in favor of dismissal, while the second and fourth factors are neutral. However, no one factor is dispositive. *Lewis*, 564 F.3d at 576. Viewing the record as a whole, the Court thus

-ST

recommends that Defendants' counterclaims be dismissed with prejudice for failure to prosecute. *See Telluric Labs*, 2023 WL 6307995, at *7 (dismissing corporate defendant's counterclaims with prejudice and collecting cases).

## CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's motion for default judgment be DENIED WITHOUT PREJUDICE, that Plaintiff's motion to dismiss Defendants' counterclaims for failure to prosecute be GRANTED, and that Defendants' counterclaims be DISMISSED WITH PREJUDICE.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

                                     /s/
                                Steven L. Tiscione
                                United States Magistrate Judge
                                Eastern District of New York

Dated: Central Islip, New York
        August 30, 2024